J. S Houseman, Administrator, etc., of Elizabeth Grossman, deceased, v. Ira Grossman, G. W. Grossman, Joseph Grossman, Elvira Showers, Jane Neese and Mary Gillett, Appellants.

| 177 | 453 |
|---|---|
| 193 | 61 |
| 193 | 66 |
| 177 | 453 |
| 22 SC | ¹400 |
| 177 | 453 |
| 26 SC | ¹ 52 |
| 177 | 453 |
| e212 | 227 |
| 177 | 453 |
| 33 SC | ¹320 |
| 177 | 453 |
| 218 | 140 |

*Equity—Creditor's bill—Fraudulent conveyance.*

In Pennsylvania a creditor's bill may be maintained to subject the land of a debtor which has been conveyed away in fraud of creditors to the claims of the latter, by setting aside the fraudulent conveyance, if the debtor is dead, and the creditor has a lien upon the land.

*Husband and wife—Fraudulent conveyance.*

If a wife is a creditor of her husband she is within the protection of the statutes against fraudulent conveyances, and is entitled to invoke their benefit in case of a conveyance by her husband in fraud of her rights.

*Deeds—Fraudulent conveyance—Creditors of the grantor.*

A debtor cannot strip himself of his property by a conveyance to a third party, reserving at the same time a benefit therein to himself, or to mem-

bers of his family. The act is fraudulent on its face so as to affect not only the grantee but, where the reservation appears in the deed, third parties also claiming under him.

*Married women—Fraudulent conveyance—Judgment.*

A married woman who joins with her husband in a conveyance of his lands to the husband's sons in consideration of the support of herself and her husband is not thereby barred from enforcing the lien of a judgment which she had acquired against her husband's estate for debt existing prior to the conveyance.

A married woman joined with her husband in the conveyance of the latter's lands to her husband's sons, at a time when the husband was owing her $1,900 for borrowed money. The consideration named in the deed was $9,000, the payment of two debts of the husband amounting to $1,200, and the maintenance of the grantor and his wife. The two debts were paid, but the evidence tended to show that it was not intended that the remainder of the money consideration should be paid. It also appeared that the agreement as to the maintenance was not fulfilled. The sons went into possession, and the husband and wife removed to a small place owned by the wife. After the husband's death, the wife obtained a judgment against her husband's estate for $1,900. The evidence also showed that statements were made to the wife at the time of the execution of the deed which were not in fact true, and which tended to mislead her into the belief that her claim would be paid. *Held,* that the wife's administrator could enforce the lien of her judgment against the land in the possession of her husband's sons.

Argued April 22, 1896. Appeal, No. 43, Jan. T., 1896, by defendants, from decree of C. P. Centre Co., Jan. T., 1893, No. 154, on bill in equity. Before STERRETT, C. J., McCOLLUM, MITCHELL, DEAN and FELL, JJ. Affirmed.

Bill in equity to set aside an alleged fraudulent conveyance.

The master reported the facts to be as follows:

1. That Elizabeth Grossman, complainant's intestate, died on or about October 7, 1892.

2. George Grossman died on or about June 19, 1891.

3. George Grossman left to survive him six children, namely: Ira Grossman, G. W. Grossman, Joseph Grossman, Elvira Showers, Jane Neese and Mary Gillett.

4. Elizabeth Grossman was a creditor of George Grossman, having an obligation against him for $1,900, upon which an action was commenced in the court of common pleas of Centre county to No. 331, August term, 1891, in which a judgment

was rendered in favor of the complainant and against the estate of George Grossman, deceased, on the 5th day of September, 1892, for the sum of $2,036.

5. George Grossman, in his lifetime, was the owner of a piece or tract of land situate in Potter township, Centre county, Pennsylvania, containing about one hundred and eighty-six acres. The title to said land was solely and absolutely in George Grossman. His wife, Elizabeth Grossman, had no title or interest therein, except her possible contingent interest of dower dependent at that time upon her surviving her husband.

6. On the 11th day of April, 1888, George Grossman and Elizabeth Grossman, his wife, executed and delivered three several deeds covering the land aforesaid. The grantees in said deeds being Ira Grossman, George W. Grossman and Joseph Grossman, sons of said grantor, which said deeds conveyed to the respective grantees portions of said one hundred and eighty-six acres for the expressed consideration of $3,000. In addition to the expressed consideration each of said deeds contained a further consideration providing for the support and maintenance of George Grossman and Elizabeth Grossman, his wife, during the term of their natural lives, and also providing for the payment of $1,000 to the daughters of said Grossman at the end of five years. The said several deeds were executed on or about the day of their respective dates and delivered to the respective grantees, who caused the same to be placed of record in the recorder's office of Centre county. Afterwards the said grantees together paid the sum of $1,063 to the estate of Wm. A. Thomas, deceased, in payment of a mortgage given by George Grossman to the said estate, which mortgage was a lien upon the lands at the time of the sale thereof by the said George Grossman to his sons.

7. The sales by George Grossman and his wife to the said Ira Grossman, Geo. W. Grossman and Joseph Grossman were not fraudulent as to Elizabeth Grossman or any other creditor. Neither was it collusive, for no evidence anywhere in this case exists to show that it was the intention to hinder or delay any creditor or creditors in the collection of their claims. In fact it seems that there were no creditors at this time excepting Elizabeth Grossman and the Thomas estate. Mrs. Grossman was perfectly cognizant of the entire transaction. She was con-

sulted with reference to these sales of the real estate; every precaution was taken by herself and by the other parties in interest to have her thoroughly understand the import of the transfers, and to that end a friend and neighbor was sent for at her request and by her selection. This person was Mr. Alexander Kerr, who was intelligent and capable of advising Mrs. Grossman in the premises. When he arrived at the house and examined the papers, he assured her, as Mr. Reifsnyder had done and previously advised her, that the deeds provided her a living. This satisfied her; she had previously told Mr. Reifsnyder before Mr. Kerr arrived, that if the deeds provided for a living she would sign them. The evidence in this case in every way thoroughly negatives the idea of fraud and collusion.

8. There may be some doubt under the evidence as to whether the deeds were acknowledged by Elizabeth Grossman separate and apart from her husband, George Grossman, as is intended by the act of assembly to bind a married woman, but there is no evidence that her execution of them "was procured through her ignorance of the result and upon false and fraudulent representations as to the legal effect thereof and through duress and compulsion on the part of George Grossman, deceased." The testimony on the part of complainant shows that she was solicitous as to her living. This was secured in the deeds themselves. She was assured of this by her own friend and adviser, who was sent for at her request. She was given every opportunity to satisfy herself so that there could have been and there were no misrepresentations, fraudulent or otherwise, and no advantage was taken of her whatsoever and no imposition was practiced upon her.

9. It is not necessary for the master to determine at this time whether the acknowledgment of the deeds by Elizabeth Grossman was taken in the manner directed by law to bind a married woman.

10. That the allegations contained in the sixth and eleventh paragraphs of complainant's bill, that the transfers of the real estate to the three sons of the grantor were made to hinder and delay Elizabeth Grossman as a creditor and to defraud her out of her claim, and with the sole intention on the part of George Grossman to avoid a payment of the said claim, cannot be sustained. The answer of respondents denies this charge. In

view of this answer the evidence alone could substantiate complainant's contention, but the only evidence in the cause on this branch shows that the sons never knew that Elizabeth Grossman had any claim until some time after these deeds had been accepted and the parties had gone into possession of their respective portions of the premises conveyed. There could, therefore, have been no conspiracy or combination to defeat her out of the claim when she failed to make it known to the parties interested when the contracts were being made.

The master recommended a decree dismissing the bill.

Exceptions to the master's decree were sustained in an opinion by ARCHBALD, P. J., of the 45th judicial district, specially presiding, which was as follows:

This is nothing more nor less than a creditor's bill unfamiliar to us in Pennsylvania but familiar enough elsewhere, and a well recognized subject of equity jurisdiction: Creditor's bills, 4 Am. & Eng. Ency. of Law, p. 573, et. seq. Fraudulent conveyances, 8 ibid. 771, et seq. The purpose of this particular character of creditor's bill is to subject the land of the debtor, which has been conveyed away in fraud of creditors, to the claims of the latter by setting aside and avoiding the fraudulent conveyance. In Pennsylvania in ordinary cases this is accomplished by proceedings not in equity but at law, by obtaining judgment, levying upon the property and selling it at sheriff's sale, and then contesting the title of the fraudulent vendee in an action of ejectment; a creditor's bill, it has been held, cannot be maintained: Girard National Bank's Appeal, 13 W. N. C. 101. But the case with which we have to deal is not an ordinary one; the debtor is dead and the case is complicated by all which that circumstance entails. A judgment against his personal representatives would give no independent lien upon his lands on which a levy and sale could be effected, so that the cumbrous process of a sci. fa. against his heirs would have to first be resorted to, if indeed that even would yield any profitable result. The heirs of a fraudulent grantor have no lands of their ancestor; the title is not in them but in the fraudulent vendee and it is there that it must be seized and subjected to the creditor's claim. In the meantime there is nothing to prevent the vendee from selling and disposing of the property and

thus bringing to naught the creditor's attempt to reach it. As is said in Fowler's Appeal, 87 Pa. 449, equity furnishes the appropriate remedy for such a case. The decision there made is direct authority for maintaining this bill. No material distinction is to be drawn between the two cases. The fact that the deceased vendor in that instance was a resident of Ohio does not seem to me to seriously enter into the question; it was no doubt a circumstance but not a controlling one. It was not sufficient in itself to give jurisdiction, if not otherwise obtained, and no great stress is laid upon it. The objection to the jurisdiction which prevailed in the court below was that the creditor had not reduced his claim to judgment, but this was disposed of by showing that as a debt of the decedent it was a lien by virtue of the statute. That objection is obviated here where judgment has been already obtained, and the argument based upon that circumstance that the complainant should proceed at law has been disposed of. It does not seem to me, therefore, that the bill ought to be dismissed upon the ground that the remedy is at law and not in equity. Even assuming that there may be a legal remedy the jurisdiction in equity is at least available as well as much more effective, and the objection not having been raised in limine, either by demurrer or answer, ought not to prevail at this late stage: Adams' Appeal, 113 Pa. 449; Mortland v. Mortland, 151 Pa. 593.

It is well settled that a wife, if a creditor of her husband, is within the protection of the statutes against fraudulent conveyances and entitled to invoke their benefit in case of a conveyance by her husband in fraud of her rights: 2 Bigelow on Fraud. 154; 8 Am. & Eng. Ency. of Law, 750, note; Chase v. Chase, 105 Mass. 385. The right of Mrs. Grossman, therefore, and of the complainant as her executor, to follow up the fraud if any was perpetrated upon her, cannot well be questioned. Does the case disclose any fraud of this character? Aside from the fact that she joined in the deed which conveyed the land of her husband to the three sons, Ira, Joseph and George W., there is no doubt that the conveyance was constructively at least in fraud of the rights of Mrs. Grossman as a creditor of her husband. This plainly appears by reference to the line of cases which hold that a debtor cannot strip himself of his property by a conveyance to a third party, reserving at the same time a

benefit therein to himself or to members of his family. The act is fraudulent on its face so as to affect not only the grantee, but where the reservation appears in the deed, third parties also claiming under him: McAllister v. Marshall, 6 Binney, 338; Johnston v. Harvey, 2 P. & W. 82; McClurg v. Lecky, 3 P. & W. 83; Sanders v. Wagonseller, 19 Pa. 248; Mackason's Appeal, 42 Pa. 330; Hennon v. McClane, 88 Pa. 219; Kirker v. Johnson, 13 W. N. C. 385; Albee v. Webster, 16 N. H. 362; Morrison v. Morrison, 49 N. H. 69. The case of Sanders v. Wagonseller, 19 Pa. 248, is very close to the one in hand. There a father conveyed his property to his three daughters to whom it was claimed that he was indebted and they by an agreement in writing of the same date in consideration of the conveyance, and in addition to the consideration money there mentioned, agreed to support and maintain him for life, and it was held that this was fraudulent per se, as to existing creditors. In Johnston v. Harvey, 2 P. & W. 82, this rule was enforced against a party who had purchased from the fraudulent grantee, the suggestion of existing indebtedness and the agreement for maintenance appearing on the face of the deed. And in Kirker v. Johnson, 13 W. N. C. 385, the knowledge by the grantee of any existing indebtedness of the grantor was held immaterial. In the present instance the conveyance was of all the grantor's property except a few acres of timber land which were subsequently sold for payment of debts by his administrator for $125. Divested of the farms which he conveyed to his sons he had practically nothing. But it may be claimed that the consideration expressed in the deeds outside of the agreement for maintenance was the full value of the land and therefore there could be no fraudulent purpose in the transaction. This is upon the principle asserted in Preston v. Jones, 50 Pa. 54, where it was held that a conveyance by a father to his sons in consideration of the payment of his debts where the debts amount to the full worth of the property is not voluntary and fraudulent, but for a complete and valuable consideration. It is still better exemplified for our present purpose in Albee v. Webster, 16 N. H. 362, where the rule we are considering is thus stated. A conveyance on consideration in part that the grantee will support the grantor or members of his family is fraudulent and void as to existing creditors if the agreement for support furnishes a

substantial part of the consideration; but if it be shown that the grantee has paid or secured the full value of the land apart from the agreement for maintenance the obligation to maintain will not avoid the conveyance.   To the same effect is Morrison v. Morrison, 49 N. H. 69.   This calls upon us to inquire into the consideration of the conveyance in question.   The sum expressed in each of the deeds is $3,000, or an aggregate of $9,000 in all for the land.   This under the evidence was the full value of the property.   Without dwelling, however, upon the fact that it was neither paid nor secured to be paid to Grossman by the boys, was the agreement for maintenance apart or outside of this ?   The provision in the several deeds upon this subject is by no means clear ; but without resorting to the rule that as a condition of the conveyance it is to be taken most strongly against the granting party, there is sufficient to warrant us in holding that the agreement to maintain was a part of the expressed consideration of $9,000, and not in addition to it.   That seems to have been the understanding at the time as we gather from the testimony of Mr. Reifsnyder.   The parties themselves also so treated it, if we are to look to their actions, for there is no evidence that, except the payment of the $1,000 mortgage held by the Thomas estate and the note of Mrs. Rhone of about $100, anything was ever done towards recognizing the rest of the $9,000, as a subsisting debt or obligation. This, moreover, is the only reasonable construction to be drawn from the deeds themselves.   After providing that the conveyance shall be subject in each case to one third the maintenance of Grossman and his wife for life, they severally go on to provide that " upon failure [to] pay or cause to be paid one-third of the cost of the keeping and maintenance of them, the said George Grossman and Elizabeth Grossman, his wife, during their natural lives, one thousand dollars of the purchase money aforesaid, shall remain in the premises for five years, or at the option of the said George Grossman at the end of the five years, if still living [;] and at the end of said time the principal sum of said one thousand dollars shall be paid to Elvira Showers, wife of Jacob Showers, Jane Neese, wife of Thomas Neese, and Mary Grossman, daughters of the said George Grossman, or their heirs, share and share alike."   It is a good deal of a guess to say just what this all means, but one thing seems plain

and that is, that one third of the consideration of $3,000 repre-
sents the maintenance of Grossman and his wife. It is that
which in default of their support is to remain in the premises
for five years—whatever that may mean—and is then to be at
the option of Grossman, if living, and which is appointed to
go to his three daughters at his death, if not already appro-
priated (if I may so conjecture) by himself. The maintenance
being thus made an equivalent of the one third of the consider-
ation is an integral part of it and the whole conveyance is ef-
fected thereby, and made subject to the rule by which such
transactions are declared fraudulent as to creditors. If, there-
fore, Mrs. Grossman had taken no part in the transaction there
could be no question of her right to maintain this bill.

This brings us to the inquiry what part she took in the trans-
fer of the property to the defendants and how far she is bound
thereby. This is not to be answered—it may be premised—by
deciding whether or not there was a valid acknowledgment of
the deeds which she executed ; that only goes to the sufficiency
of the deeds to bar her dower. The real question is whether
having knowledge of, and participating in, the transaction to
the extent that she admittedly did, she can now allege that it
was fraudulent. If Mrs. Grossman were sui juris there could
be no doubt of the answer. Leaving out the question of actual
fraud an ordinary person cannot assent to the transfer of prop-
erty and then be heard to say that it is per se fraudulent.
Volenti non fit injuria is the maxim and it applies to such a
transaction. But Mrs. Grossman was not sui juris ; on the con-
trary she was a married woman, with all the disabilities of cov-
erture upon her. What effect then should be given to the fact
of her joining in the conveyance of this property ? I must con-
fess that this is not an altogether easy question to answer. On
the one hand, even prior to the married woman's act of 1887,
the courts had gone a long way in holding a married woman
bound by her acts when dealing with her personal property or
choses in action. Thus in Bond v. Bunting, 78 Pa. 210, a
married woman holding an insurance policy upon the life of her
husband, executed during his lifetime in conjunction with him
an assignment of it to a trustee for the benefit of his children.
After his death she attempted to repudiate the assignment, but
it was sustained against her. In Fryer v. Rishell, 84 Pa. 521,

a married woman who had sold her land by articles duly executed, subsequently assigned her interest in the articles to a third party receiving a conveyance of other land in payment therefor.   She did not acknowledge the assignment, but having sold the land conveyed to her in payment, it was held that she could not repudiate the assignment, however defective.   In Brown's Appeal, 94 Pa. 362, a married woman who had a judgment against her husband which was a lien upon his real estate agreed to the postponement of her lien in favor of a third party from whom the husband borrowed money on the strength of such release, and she was held bound thereby.   So in Powell's Appeal, 98 Pa. 403, it was held that a release by a married woman to her husband of a legacy charged on land, even though defectively acknowledged, could not be repudiated as to creditors of the husband who had acted thereon.   In Grim's Appeal, 105 Pa. 375, where certain heirs who were married women had expressed their approval of the course of the executor of the estate with regard to the purchase by him individually of a certain part of it, it was held that they were bound to the observance of good faith in the matter, and precluded from subsequently excepting thereto.   But it is to be observed in all these cases that there was some direct act on her part to which she was held, and by which she was equitably if not legally obligated.   There was an actual assignment of her policy and of her articles, a specific release of her lien and of her legacy, and a positive indorsement of the sale to himself by the executor.   In neither case was it a matter of implication or indirection but rested on positive and affirmative acts.   On the other hand, in Klein v. Caldwell, 91 Pa. 140, where a married woman joined in a deed of land belonging to her husband, she was held not prevented thereby from enforcing a mortgage which she held against the property.   "The deed on its face," says MERCUR, J., "did not profess to discharge the lien of the mortgage. The fact that Mrs. Barnhart united with her husband in the deed whereby he conveyed his land did not operate as an extinguishment of the mortgage thereon held in trust for her."   It was further held that her verbal declaration at the time that she was satisfied with the sale did not work an estoppel ; it was no more than what she asserted by uniting in the deed with her husband and could not enlarge the effect of that act.   So in

Hughes v. Torrence, 111 Pa. 611, a married woman joined with her husband in a conveyance of land and subsequently took an assignment of a judgment which was at the time a lien upon it, and it was held that she was not affected by her husband's warranty against incumbrances and was not estopped from enforcing the judgment. Fellbush v. Fellbush, 15 W. N. C. 237 (per MORROW, P. J.), is in line with both these cases and decides that a married woman who holds a judgment against her husband and joins with him in a conveyance does not thereby release the lien of her judgment nor preclude herself from enforcing it against the land conveyed. To substantially the same effect is Trullinger v. Charles, 129 Pa. 289. It seems to me that the principle exemplified in this latter line of cases is the one which should prevail here. There is nothing on which to predicate an estoppel or from which to say in equity and good conscience that Mrs. Grossman ought to be precluded from asserting the inherent fraud in the transaction and the manifest detriment to her rights as a creditor of her husband. She was not there as a grantor nor as a contracting party. The only thing she was asked to do and the only thing she did was to join in the conveyance with her husband so as to bar her dower. The land was his and she received no part of the consideration for it then or afterwards, not even of the support agreed to be given. We cannot assume from the transaction that there was any intent on her part to relieve her husband's property from the claim which she had upon it as a creditor, and considering her disabilities we have no right to carry what she did one step further than it actually goes. While it is true that this is a proceeding in equity, and that the equities rather than the strict legal rights of the parties are to be regarded, yet equity follows the law and if—as it seems—she could have recovered judgment against her husband's administrator after his death, levied upon the property and sold it, and then in an action of ejectment contested the title of the defendants as fraudulent vendees, there is no good reason why she or her executor should not now have equivalent relief here. The fraud which is the substantial basis of the proceeding is the same in either case and the disability of the married woman who is affected as creditor preserves her right to take advantage of it, even though she joined

with her husband in the deed in release of her dower.    Her position as wife and her rights as creditor are severable.

But there is even stronger ground, if possible, for annuling the deeds to the defendants than what has thus far been advanced.    They are not only constructively but positively fraudulent.    The master has not so found, but it seems to me that he ought, under the evidence, to have done so.    The defendants, not being within the exception of the act of 1891, P. L. 287, were clearly incompetent to testify in their own behalf as to anything which happened in the lifetime of Mrs. Grossman. Their denial of any knowledge of their stepmother's claim goes, therefore, for naught, and should have been disregarded.    They were competent, however, to testify in contradiction of the testimony of Esquire Houseman and Henry Shadow, and their denial there must of course be given due weight.    But in view of their manifest interest it ought not to prevail as it seems to me over the precise and particular story of these indifferent parties, strengthened and confirmed as they are by other competent testimony.    While the master possessed the advantage of seeing and hearing the various witnesses at the time, yet it is difficult to say how far he has been influenced in his conclusions by that part of the defendant's testimony which he accepted, though incompetent, and upon which, from his 10th finding, it would appear that he placed considerable reliance.    He also appears to think that because Mrs. Grossman knew of the transaction and assented to it there could be no fraud or collusion, and yet it is manifest that even though she should be regarded as having assented to what was done, she could only be held to it upon the basis that it was squarely and honestly intended.    If the purpose was really fraudulent her assent would not prevent her avoidance of the transaction.    It would be one thing for her to agree to a bona fide sale of the farms to the sons for full value, with a provision for the maintenance for life of herself and husband, and quite another to that which was such in name only and was a mere cover to get the property of her husband who was her debtor out of her reach.    I feel at liberty, therefore, to disregard the findings of the master upon this question and to draw my own conclusions from the evidence.

The first thing to be noted with regard to the transfer of this property is that the consideration for it was in large part merely

nominal. This, at least, is the conclusion to which we must come if we look to what was actually done towards the satisfaction of it. The only substantial thing to which the defendants can point is the payment of the Thomas mortgage, $1,063, and the debt to Mrs. Rhone, about $100. But the Thomas mortgage was paid a week before the deeds were executed, the satisfaction of record being April 4, 1888, and the date of the deeds, as well as the date of their acknowledgment, April 11, so that this was a past consideration at the time they were executed. Assuming, however, that the defendants paid this mortgage in anticipation and upon the promise of a conveyance, what else did they do in consideration of it? The two debts so paid amount together to less than $1,200. This leaves $7,800 of the $9,000, the supposed consideration, unsatisfied. If $3,000 more be taken out of this to represent the value of the support and maintenance agreed upon, to be turned over eventually to the sisters, there is still $4,800, or over one half of the consideration, unprovided for. If with the master we assume from the acknowledged receipt of the purchase money in the deeds that between the father and the sons the matter was regarded as fully settled, we reach the conclusion that to this extent at least the consideration named in the deeds was never intended to be called for, and the transfer of the property was so far without value, a gift fraudulent as to creditors. But we really are compelled to go much further than this by the evidence. The agreement for support was never insisted on, and it is difficult to resist the conclusion that it never was intended to be. Why it was inserted unless as a mere cover and because that was the one thing at the time which Mrs. Grossman seems to have been concerned about, we can hardly conjecture. Mr. Grossman lived for over three years, and his wife for four years and a half, after the deeds were delivered, and in that whole time, by the defendants' own statement, they only gave them a little corn and grain and a few vegetables, assisted their father a little in the meager farming which he did on his wife's property, and hauled some wood for their stepmother after his death. On the other hand, immediately upon the execution of the deeds, they went into possession of the property conveyed to them while their father and his wife occupied and received their subsistence out of the house and lot and the few acres which she

personally owned. It might be added that at their father's death they did not even bury him, but directed the undertaker to try to get the burial expenses out of their stepmother, " Old Betsy," as they called her. Neither do we find that before they were stopped by the filing of this bill they had taken any steps towards paying off that part of the consideration which was to go to their sisters. These circumstances are anything but suggestive of a transfer in good faith and for a consideration of value received, and they afford a fit introduction for the declarations of the defendants and their father in further evidence of the character of the transaction.

Looking to these declarations, they disclose a clear intent to defraud Mrs. Grossman out of her claim. She was at the time, as it is indisputably proved, the holder of the bond of her husband, dated January 20, 1874, for $1,700, for borrowed money, payable without interest at his death or at her death to her personal representatives, and his note of $200 dated June 13, 1876, due one day after date. It appears that some time in 1888 or 1889, after the property had been transferred to the defendants, Mrs. Grossman was informed that by signing the deeds she had relinquished her right to collect her claim from her husband, and came to the plaintiff, a justice of the peace of the neighborhood, to consult him. He took counsel of an attorney here at Bellefonte, who wrote a letter to Grossman to go to 'Squire Houseman and make satisfactory arrangements for the payment of the debt. In response to this he came to the plaintiff's office. When there his attention was called to the papers in plaintiff's hands, but while he acknowledged the debt, he claimed that it was cut out by the statute of limitations, and further added, " We have that all fixed. I will never pay that. . . . He said he didn't own anything, he had conveyed his property all away." This was the substance of Mr. Houseman's evidence in chief, and on cross-examination he repeats it as follows:

" Q. Now just give his own language as your remember what he said when he told you that those papers were fixed and he would never pay that? A. His attention was called by this letter from this attorney and he appeared and acknowledged the indebtedness; he said he got this money but he said he would not pay it, as the statute of limitations had cut it out, and further said that he had arranged his property so that he was

not worth anything; he had deeded his property all away; he wasn't worth anything. I then told him that his deeds were fraudulent, and told him I wouldn't give the worth of the paper for it; he sat there awhile and commenced to sweat a little about it. Q. Did he say anything? A. He said he wouldn't pay it unless the law would compel him; when I told him the deeds were fraudulent he made no reply; he said afterwards that he wouldn't pay the claim."

So also to John Mitterling, a neighbor, in speaking of getting his debts off his shoulders by the transfer of the property, he said that " the boys would never have to pay the debts to her," Mrs. Grossman. It is somewhat significant that before this, in speaking to the same witness, he had always said that his wife should be paid. Henry Shadow also had a conversation with Mr. Grossman after the conveyance, which he characterizes as of the same effect as that which he had with the defendant, Ira Grossman, the son. His interview with Ira is detailed as follows:

" Q. Mr. Shadow, state whether you had a conversation some time after April, 1888, with Ira Grossman, with regard to a deed for his property that he got them from his father? A. Yes, sir. Q. What did he say? A. I was out there and he told me after they had bought the farm that they had them in such a shape that they had their stepmother where the hairs were short. Q. What did he refer to? A. To the money that she had in the farms. Q. What did. he say, if anything, with regard to having signed off, or did he use such an expression? A. He said this way: 'we have been trapping her for a long time, but we caught her at last, and we have her just where the hairs are short.' Q. Well, Mr. Shadow, did he refer to the collection of a debt or to the transfer of the real estate from George Grossman to his sons? A. He meant the money that she was wanting back again. . . . Q. Did he tell you how they had caught or trapped her? A. Yes, sir; by getting her to sign off on the deeds from George Grossman to his sons, so he could sell the farm to the boys."

Again we have an interview between 'Squire Houseman and Joseph Grossman.

" Q. State whether or not you had an interview with one of these defendants a short time after the interview with George

Grossman? A. I had with Joseph; he came to my place there and in the course of our conversation I called his attention to this point; he was building a house and he came to buy hair from me, and when I called his attention to it he spoke ungentlemanly of his father, and he said his father told him that he had fixed everything so that they would never need to pay out that money; and I told him what my counsel had told me, and he said 'sue the old bugger at once.'"

Now, at the time the deeds were executed, it is undisputed that Mrs. Grossman, at first, objected to signing them. 'Squire Reifsnyder, who was there to take her acknowledgment, says that she said if she did she would have nothing to live on, referring to parting with her dower interest in the land. But that was not the only thing in her mind as is evident, because he further says that in the course of the discussion there about the deeds she inquired where she was to get the money that her husband owed her, to which the latter responded: "You have a paper for what I owe you." The explanation given to Mrs. Grossman by her husband at the time as to the reason for the transfer was that he had to do this on account of his indebtedness, not having any way by which he could raise any money, and that the boys would have to pay his debts and keep them as long as they lived. The defendant, Joseph Grossman, was present at this conversation, although the others were not. It is true that Mr. Kerr, an old gentleman then about eighty-five, a neighbor in whom she had confidence, was sent for to advise with Mrs. Grossman with regard to the transaction. But his attention was directed solely, so far as we are informed, to the question of her support or living, and as that on the face of things was provided for he could not, as a layman, say otherwise than that it was sufficiently secure to her. It needs no argument to show that the highest good faith was due to Mrs. Grossman from the parties who were effecting this arrangement. On the one side was her husband and her stepchildren and the magistrate whom they had there to see to the execution of the papers. On the other, except for the friendly counsel of an aged neighbor, she stood unaided and alone. Her husband was about to strip himself of the substance of his property and dispose of the only security which she had for the money she had lent him years before without interest. And

yet the explanation afforded her for the transfer was that he could not with property worth several thousand dollars take care of debts against it to the amount of $1,200, and the assurance given with regard to her own debt, that she had the worthless paper on which it was written. When we take the character of the transaction, the parties to it, the manner in which its effect upon her interest was obscured, and the subsequent declaration of three at least of those who were engaged in it as to what they had succeeded in accomplishing, how can we fail to conclude that, however fair on the surface, the real purpose and intent of the transfer was to relieve the property of the husband of the debt of the wife in favor of the defendants, his children? This may not have been the only purpose of it; there may have been part of it which was honest and legitimate; it is sufficient, however, that this fraudulent scheme was unquestionably involved in it. Notwithstanding the denial in the answer and the contradiction by the defendants under oath of the testimony which bears against them, this is the result which I reach from a careful consideration of the whole case. It follows that the conveyances to the defendants were fraudulent and void as to the plaintiff's testatrix (Fleming v. Ogden, 152 Pa. 419; Hummel's Estate, 161 Pa. 215), and the plaintiff is entitled to the substance of the relief asked for. The 2d, 5th, 7th, 8th and 11th exceptions are sustained.

Let a decree be drawn, making the preliminary injunction perpetual; declaring null and void as against the complainant the several deeds bearing date April 11, 1888, from George Grossman and wife to the defendants Joseph, Ira and George W. Grossman, subjecting the land therein conveyed to the payment of the complainant's judgment No. 331, August term, 1891, in the common pleas of this county, debt, interest and costs, together with the cost of this proceeding; and directing that unless payment thereof be made within sixty days thereafter, the said land be sold by a trustee to be appointed by the court for that purpose, and further directing that the defendants, Joseph, Ira and George W. Grossman, pay the costs; unless the same be paid from the sale aforesaid.

The preliminary injunction enjoined Joseph Grossman, Ira Grossman and G. W. Grossman from selling and disposing of any of the real estate of the said George Grossman conveyed to

them by the said George Grossman, deceased, by deeds dated April 11, 1888, or from in any manner incumbering the same by the lien of debts, etc., and further the said G. W., Ira and Joseph Grossman, are enjoined and restrained from paying to the said Elvira Showers, Jane Neese and Mary Gillett, or their heirs, executors or administrators and assigns, the consideration provided in aforesaid deeds to be paid to them by the said grantees, or any part thereof, or from paying any portion of the consideration or any other person until the further order of the court.

## DECREE.

Now, October 2, 1895, this cause came on to be heard at the March term of this court and was argued by counsel. Whereupon it is considered, adjudged and decreed that the deed from George Grossman to Joseph Grossman, dated April 11, 1888, conveying sixty-seven acres in Centre county, Pennsylvania, the deed from George Grossman to Ira Grossman, dated April 11, 1888, conveying fifty-five acres in said Centre county, and the deed from George Grossman to G. W. Grossman, dated April 11, 1888, conveying sixty acres in said Centre county, more particularly described and referred to in the bill, be and the same are hereby declared null and void as against the complainant, J. S. Houseman, executor for Elizabeth Grossman, deceased, that the lands in the several deeds described be and the same are hereby made subject to the payment of the judgment of the said complainant in the court of common pleas of Centre county, No. 331, August term, 1891, debt $2,036 interest from 30th of August, 1892, and $72.50 costs; that the injunction heretofore issued be made perpetual, unless the defendants within sixty days from filing of this decree shall pay the said judgment, debt, interest and costs as aforesaid, together with costs of these proceedings (being credited with any costs by them heretofore paid); and in case such payment shall not be made within sixty days as aforesaid that the said lands be sold by a trustee, to be appointed by the court for that purpose. The proceeds to be applied first, to the payment of the said judgment of the complainant, debt, interest and costs as aforesaid, and then to the costs of this proceeding, and the defendants, Joseph, Ira and Geo. W. Grossman, are further directed to pay the costs of this proceeding, unless the same be paid from the said sale.

1896.]              Assignment of Errors—Arguments.

*Error assigned*, among others, was above decree.

*Calvin M. Bower*, with him *Ellis L. Orvis*, for appellant.— Where the plaintiff has a complete and adequate remedy at law, a court of equity will not interfere : Gallagher v. Fayette County, 38 Pa. 102; Girard Nat. Bank's App., 13 W. N. C. 101.

Where a judgment creditor desires to avoid an alleged fraudulent conveyance of land by his debtor, his proper course is to levy on the land, buy in the same at sheriff's sale and bring an action of ejectment: Appeal of the Girard Nat. Bank, 13 W. N. C. 101; McAllister's App., 6 Binn. 338; Johnson v. Harvey, 2 P. & W. 82; McClurg v. Lecky, 3 P. & W. 83 ; Sanders v. Wagonseller, 19 Pa. 248; Stewart v. Coder, 11 Pa. 91 ; Taylor's App., 8 W. N. C. 192; Clark's App., 62 Pa. 447 ; Hennon v. McClane, 88 Pa. 219.

Objection to jurisdiction in equity need not be taken in limine. Filing an answer and proceeding to proof does not waive the objection. The objection may be made on final hearing: Spangleberger v. Leger, 2 Kulp, 29; Wiser's App., 9 W. N. C. 508; Maguire's App., 102 Pa. 120.

The master's findings upon a question of fact should not be disturbed unless there is direct evidence to convict him of error : Bugbee's App., 110 Pa. 331; Tolles's App., 22 W. N. C. 1; Kutz's App., 100 Pa. 75.

A quiescent creditor, though the conveyance be fraudulent, cannot take advantage of such a conveyance afterwards : Fowler's App., 87 Pa. 449.

A married woman may do all the acts of a person sui juris, without the intervention of any trustee, and with all the rights, duties and liabilities incident thereto, except mortgage and convey her real estate. All this she can do with the same effect as if she were not married: Robert's App., 126 Pa. 102; Act of June 3, 1887, P. L. 332; Adams v. Grey, 154 Pa. 258; Evans v. Evans, 155 Pa. 572 ; McCormick v. Bottorf, 155 Pa. 331; Abell v. Chaffee, 154 Pa. 254; Latrobe v. Fritz, 152 Pa. 224; Milligan v. Phipps, 153 Pa. 208; Campe v. Horne, 158 Pa. 511.

*Charles P. Hewes*, for appellee.—Fowler's Appeal reported in 87 Pa. 449, is the authority for this proceeding.

Equity furnishes the appropriate remedy for this case. Its first move was to enjoin the defendant from conveying or incumbering the property pending the bill. Without this cred-  itors might have been totally defeated by a sale to a bona fide purchaser.

The fact that ejectment will lie does not oust jurisdiction of equity : Mortland v. Mortland, 151 Pa. 593 ; Fleming v. Ogden, 152 Pa. 419.

If the court in which the suit is brought have jurisdiction of the cause of action, both at law or equity, it may proceed to give relief, unless the bill be demurred to on the ground that the proper remedy is at law : Sunbury & Erie R. R. v. Cooper, 33 Pa. 278.

If the averments of the bill, assuming them to be true, present a case in which equity has either concurrent or exclusive jurisdiction, the bill should not have been dismissed, especially in view of the fact that the appellees did not object, in limine, by plea or otherwise, to the jurisdiction of the court : Adam's App., 113 Pa. 449 ; Ahl's App., 129 Pa. 61 ; Edgett v. Douglass, 144 Pa. 95 ; Bank v. Bank, 1 Parson's Eq. 222 ; Johnston v. Price, 172 Pa. 427.

A debtor cannot strip himself of his property by a conveyance to a third party, reserving at the same time a benefit therein to himself or to members of his family. The act is fraudulent on its face so as to affect not only the grantee, but where the reservation appears in the deed, third parties also claiming under him : McAllister v. Marshall, 3 Binney, 338 ; Johnson v. Harvey, 2 P. & W. 82 ; McClurg v. Lecky, 3 P. & W. 83 ; Sanders v. Wagonseller, 19 Pa. 248 ; Mackason's Appeal, 42 Pa. 330 ; Hennon v. McClane, 88 Pa. 219.

Where, in a proceeding by a widow for the assignment of dower, there is interposed as a defense an antenuptial contract, executed the day of the marriage, in release of all the plaintiff's rights in the estate of her future husband, the burden is upon the defendant to follow the proof of the contract by sufficient affirmative evidence that no advantage was taken of the confidential relation, and that the contract was executed by the plaintiff with a full knowledge of its provisions and of their effect : Shea's App., 121 Pa. 302 ; Neely's App., 124 Pa. 406.

The conveyance of a wife's estate for her husband's use will

be held void, unless it affirmatively appears from the attending circumstances, or otherwise, that it was her voluntary act, and not induced by undue influence: Darlington's App., 86 Pa. 512.

OPINION BY MR. CHIEF JUSTICE STERRETT, October 5, 1896:

We find nothing in this record that requires either a reversal or modification of the decree, except as hereafter mentioned.

The questions involved, as far as they are material, have been fully considered and correctly decided by the learned judge who presided at the hearing. There appears to be nothing in either of them that requires further discussion. The period of sixty days, named in the decree, has expired, and the time should be so extended as to commence and take effect from the filing of this opinion.

With this modification, as to extension of the time within which the defendants may pay, etc., the decree is affirmed on the opinion of the learned president of the 45th judicial district, and the appeal is dismissed at the defendants' costs.